

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable George W. Cox, M. D.
State Health Officer
Texas State Board of Health
Austin, Texas

Dear Dr. Cox:             Opinion No. 0-6980
                          Re:  Can a drainage district expend
                               money on mosquito control, and
                               related matters

follows:        We quote from your letter of December 7, 1945, as

        "This Department has been carrying on quite
an extensive malaria control in war areas program with
Federal funds under the Malaria Control in War Areas
setup.  Much of this malaria control work consists of
draining and filling low areas.  The various Drainage
Districts over the State have been of particular help
in this connection.

        "Especially has the Brazoria County Drainage
District No. 5 participated in the work to the extent
of extending their drainage ditches within the dis-
trict area.  The adjoining areas have seen the benefits
of this work and are anxious to cooperate further with
this District by increasing the present boundary lines
of District #5.  The Brazosport Chamber of Commerce
has assumed leadership in bringing about better health
conditions in the entire Area.  In order that this
Department may secure the greatest benefit by way of
local contribution from the Drainage Districts, we would
appreciate your advising us on the following:

        "1.  Procedure to follow in enlarging
drainage District No. 5 by taking in contiguous areas.

        "2.  Does the present drainage law give the
drainage district authority to spend money on mosquito

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Hon. Geo. W. Cox - Page 2

control, including such items as draining of stag-
nant waters, filling of stagnant ponds, and appli-
cation of larvicides or insecticides.

"3. Can drainage funds be used for the
payment of personnel to apply such larvicides or in-
secticides, and in the purchase of such equipment
as is necessary for mosquito control work.

"4. If the drainage district does not have
the authority to spend a portion of their funds for
insecticides and the payment of personnel to apply
the insecticides and the purchase of equipment ne-
cessary for their application, would you give us the
legal procedure necessary to include these powers in
the drainage dist:ict."

We find no statute empowering a drainage district
to enlarge its boundaries, and in the absence of such legislative
authorization, it is the opinion of this department that a
drainage district cannot be enlarged.

The following underlined portions of statutes
bear upon your second and third questions:

Article 8098, Vernon's Annotated Civil Statutes,
1925 -

"A petition shall first be presented to
the Court signed by twenty-five of the freehold
resident taxpayers in the proposed district, or if
there are less than seventy-five such citizens then
by one-third thereof, whose lands may be affected
thereby, praying for the establishment of a drainage
district, and setting forth the necessity, public
utility and feasibility and proposed boundaries
thereof, and designating a name for such district,
which shall include the name of the county."

Article 8101 -

"On the day set for the hearing, any person
whose land would be affected by the creation of said
district may appear before said Court and contest
the creation of such district or contend for its crea-
tion, and may offer testimony to show that the district

Hon. Geo. W. Cox - Page 3

is or is not necessary, and would or would not be
of public utility, either sanitary, agricutural or
otherwise, and that the creation of such district
would or would not be feasible or practicable."

Article 8138 -

"At the same time that taxes are levied to
meet the bonded indebtedness, the Court shall cause
to be assessed and collected taxes upon all pro-
perty in the district, whether real, personal or
otherwise, sufficient to maintain, keep in repair,
and to preserve the improvements in the district, and
to pay all legal, just and lawful debts, demands and
obligations against such district. Such levy shall
never, in any one year, exceed one-half of one per
cent of the total assessed valuation of such dis-
trict for such year. Such taxes when so collected
shall be placed in the construction and maintenance
fund."

Your second and third questions turn on the pivotal
question of whether or not the spreading of larvicides and in-
secticides for mosquito control comes within the purposes for
which drainage districts are formed.

In determining what are the purposes for which a
drainage district is formed, we look to the expression of the
Legislature as found in the foregoing statutes. Article 8101
specifically mentions sanitation as one of the conditions that
influence the creation of a drainage district. Webster's defi-
nition of "sanitary" is as follows:

"Sanitary -- of or pertaining to health;
for or relating to the preservation or restoration
of health; occupied with measures or equipment for
improving conditions that influence health; free
from or effective in preventing or checking agencies
injurious to health."

Under the heading of "Purposes" of drainage districts
ve find in 15 Texas Jurisprudence, page 722, the following state-
ment:

Hon. Geo. W. Cox - Page 4

"Drainage districts are authorized and encouraged in the interest of good husbandry, of the public health, of the advancement of the general upbuilding of the country, and the rescuing of waste portions of lands and their being made to serve useful and profitable purposes." Hefferson County Drainage District v. McFaddin, (Civil Appeals) 291 S.W. 322, affirmed (Com. App.) 4 S. W. (2) 33.

Justice Reese of the Galveston Court of Civil Appeals in the case of Wharton County Drainage District vs. Highee, 149 S. W. 381, (Writ of Error refused by the Supreme Court) said:

"It will be observed that something else enters into the question of the creation of such districts than the benefit to or enhancement of the value of the lands in the district. The court must find that the drainage will 'be conducive to the public health or be a public benefit or utility', as a prerequisite to the creation of the district.

* * *

"Questions of public health and general public benefit and utility are to be consulted in thhecreation of a drainage district, and unquestionably these are matters of great importance."

It is a matter of common knowledge that drainage programs require many years of development, and that one of the main purposes of a drainage district is to completely drain the district area of all standing water thereby improving the land and eliminating hazards to the public health. Pending the fulfillment of these objectives, the district necessarily has to resort to temporary measures to alleviate unwholesome conditions in the undeveloped areas. These temporary measures address themselves to the sound discretion of the drainage commissioners in the district. If, in their discretion, the commissioners believe that the draining of stagnant waters, the filling of stagnant ponds, and the spreading of larvicides and insecticides should be

852

Hon. Geo. W. Cox - Page 5

performed as incidental to the final completion of the
drainage program and in aid thereof, then we conclude that
an expenditure for such purposes, including the necessary
expenses of personnel and equipment, would be lawful.

In view of the foregoing statutes and authorities,
it is the opinion of this department that your second and
third questions should be answered in the affirmative. The
disposition of these questions renders unnecessary an answer
to your last question.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By

Joe Fultz

JF:BT

